Talbott v. English.

---

TALBOTT ET AL. v. ENGLISH.

[No. 18,880.  Filed March 8, 1901.]

LANDLORD AND TENANT.—*Repairs by Landlord.*—*Constructive Eviction.*—*Discharge of Tenant from Liability for Rent.*—A tenant is not discharged from liability for rent because of a constructive eviction by reason of the repairs of the leased premises, where the tenant elected to retain possession of the leased premises and the wrongful acts complained of by the tenant were committed by third persons, without authority or consent of the landlord.  *pp. 305-310.*

Talbott *v.* English.

LANDLORD AND TENANT.—*Rents.—Acceptance of Check.—Accord and Satisfaction.*—A tenant refused to pay rent of leased premises because of an alleged constructive eviction from the premises caused by the landlord making repairs. The tenant continued to occupy the premises, and sent the landlord a statement of account claiming a balance due by reason of being kept out of possession of the premises, and money expended by him in making repairs. The tenant afterward transmitted a check for rent in accordance with the statement formerly made. The landlord acknowledged the receipt of the check "in part payment of rent" for a certain month, to which the tenant made no reply. *Held*, that the acceptance of the check did not amount to an accord and satisfaction of the landlord's claim. *pp. 311-316.*

SAME.—*Rents.—Acceptance of Check.—Accord and Satisfaction.*—A tenant sent a check on the second day of the month for a month's rent falling due on the first of the month, which was not received by the landlord until after he had instituted suit thereon. The landlord acknowledged the receipt of the check, stating that he had brought suit and had given credit for same, less the amount of attorney's fees and court costs in the suit, to which the tenant replied that if check was accepted it must be in full payment of month's rent. The landlord afterward cashed the check. *Held*, that the acceptance of the check, under the circumstances, amounted to a satisfaction of the debt. *pp. 311-315.*

SPECIAL FINDING.—*Evidentiary Facts.—Surplusage.*—While items of evidence and evidentiary facts have no place in a special finding, such matters will not vitiate the finding, but will be treated as surplusage. *p. 315.*

ATTORNEY'S FEES.—*Stipulation in Lease.—Landlord and Tenant.*—A stipulation in a lease, "And the said party of the second part agrees to pay attorney's fees and other costs pertaining to this lease or the enforcement of its provisions," is unconditional and valid. *pp. 315, 316.*

From the Marion Superior Court. *Affirmed.*

*B. K. Elliott, W. F. Elliott, F. L. Littleton, R. O. Hawkins* and *H. E. Smith,* for appellants.

*C. W. Smith, J. S. Duncan, H. H. Hornbrook* and *A. N. Smith,* for appellee.

HADLEY, J.—Six several actions were brought by the appellee against the appellants to recover the rent for the premises known as "English's Opera House." The complaints in the several actions are founded on the same writ-

Talbott *v.* English.

ten lease and are in all respects the same, except as they were for different instalments they differ in amounts and dates. The answers are the same in all the cases, viz.: (1) The general denial; (2) eviction by the plaintiff; (3) damages for plaintiff's refusal to renew the lease and set-off; (4) set-off for money expended in the erection of a new stage, and (5) payment. The cases were consolidated and tried together. The court made a special finding of facts and stated five conclusions of law, to four of which appellants excepted, and to one of which appellee excepted. The court gave judgment for appellee in five of the causes, and for appellants for their costs in the other. Errors are assigned by appellants upon their exceptions to the conclusions of law, to the ruling denying them a new trial and to the overruling of their motion for a *venire de novo.* Cross-error is assigned by appellee upon his exception to the fifth conclusion of law.

The principal contentions arise upon the issues of eviction and payment. The material facts disclosed by the special findings are that on August 21, 1893, William H. English, now deceased, by the writing sued on, leased to appellants his opera house in Indianapolis for a term of three years from June 1, 1894, for $6,250 per annum, payable in ten equal instalments of $625 each month until fully paid, beginning August 1st of each year. Appellee succeeded to the ownership of the opera house and hotel, being parts of the same building, on March 23, 1896, subject to the unexpired term of appellants' lease upon the opera house, and was entitled to the rents accruing after said date.

Relating to the third paragraph of answer the facts are: Soon after appellee became the owner of the opera house the parties expressed to each other satisfaction in their business relations with respect to the theatre, and mutually expressed a willingness to extend the lease for another period of years upon its expiration, if terms could be agreed upon. Negotiations for a renewal of the lease continued

through the summer by further conversations and corre-
spondence, and closed in September, 1896, without any
agreement for a renewal of the lease having been made. With
respect to the answer of set-off for money expended in the
construction of a new stage, in the spring of 1896, it was
agreed between the parties that appellee should furnish the
lumber and the appellants the labor for the rebuilding of the
stage, and in pursuance of which agreement appellee
did furnish the lumber and appellants the labor, and the
stage was reconstructed under said special agreement, and
not under an agreement that appellants should have the
theatre for a further term. Upon the issue of eviction the
facts are that in the latter part of May, 1896, appellee en-
tered into written contracts with carpenters, plumbers, mar-
ble workers, and layers of mosaic tiling, to make alterations
and repairs, a substantial part of which was to be done in the
theatre (which right of the landlord to make alterations and
repairs is expressly stipulated in the lease), but the greater
portion of them were in and for the benefit of the English
hotel, owned by appellee and part of the same building; that
the entrance to the theatre, being a part of the leased prem-
ises, is adjacent to the entrance and lobby of the hotel, and
separated therefrom only by a wall through which openings
for doors existed and in which doors were hung; the terms of
these contracts made each of the contractors an independent
contractor. The work done in the theatre and entrance con-
sisted of changing the steam heating apparatus in the thea-
tre, rewiring the theatre for electric lighting, and the
building of a new stage entrance from the rear. In the
main entrance of the theatre changes were made in the
wires for electric lighting; the old radiators for supplying
heat were removed, and new radiators put in; the box office
was changed from the east to the west side of the entrance;
one of the doors between the hotel lobby and the theatre
entrance was taken out and the aperture closed, and a win-
dow cut and put in the same wall; the changes in the

entrance and removal of the box-office were made with the consent and approval of the appellants; the changing of the wiring for electricity was done upon the requirements of the board of underwriters in the city of Indianapolis to lessen the risk of fire; some of the contractors began work about the 1st of June, another about the 17th of June, and another about the 30th of July, and the work continued to about the 14th of September; from an early period in the prosecution of the work of alteration and repair of the hotel the employes of the several contractors engaged in the work did at different times, and sometimes to a very considerable extent, deposit building material in the entrance to the theatre, and at one time some old tiles taken from the hotel floor were piled in the entrance to the theatre; the old radiators in the entrance were disconnected from the system of heating and allowed to stand in their old position until the new radiators were brought and substituted for them; at one time a steam heating table was brought into the entrance from the hotel and was allowed to remain there for some time, but it was so done with the express consent of the defendants; and a small mortar box was constructed in the entrance by some of the employes of one of the contractors; that the amount of building material and other matter thus placed in the entrance would greatly hinder the passage of persons through such entrance, and it would scarcely have been practicable to have given any performance in the theatre while the entrance was thus encumbered, but at no time was the entrance so encumbered but that a few workmen might have removed it in one day or less. Appellee was in the city and living in the hotel from the time of entering into said contracts until about the 24th of July; that on one occasion he saw an employe of one of the contractors doing some work in the theatre entrance, to be used in the hotel, and notified him it could not be done there, and it was promptly removed. At another time he found and ordered buckets used by the workmen removed from the theatre en-

trance.    Shortly before June 15th, the appellants desired to give a series of entertainments at the English Opera House, but finding that the theatre was not then in a suitable condition transferred the same to the Grand Opera House, another theatre under their control in the city of Indianapolis; that no complaint was made by appellants to the appellee, nor to any agent or representative of the latter of the condition either of the theatre or the entrance thereto until November 5th, although appellee, or his general agent, or his architect in charge of the work under said contracts, was at all times in the city and living at the hotel.    On August 1, 1896, appellants transmitted by mail to appellee a check for $625, being the instalment of rent that day falling due, without any statement or complaint.    The last performance before the end of the season of 1895 and 1896 was given on the 19th day of May, 1896, and at that time the house was not engaged for any other performance before the 1st of September; an engagement was advertised for the night of August 4th, but the same was transferred to and given at the Grand Opera House under the management of the defendants, and also a series of performances was advertised for the week beginning September 7th and running through the week and which were likewise transferred to the Grand Opera House.    The entrance to the theatre was cleared out and the sides repapered on or prior to September 14, 1896, and from that date till the end of the lease the appellants gave the usual performances therein; the instalments of rent falling due on the 1st of September and October, respectively, were not paid.    Neither appellee nor any person acting by his authority ever authorized any contractor or other person to deposit any building material or other substance used in the alteration or repairs of the hotel in the entrance of the theatre, nor did appellee intend by any act of his to interfere with appellants' possession and enjoyment, except so far as they were consented to by appellants or authorized by the terms of the lease; that all the

Talbott v. English.

work provided for by the several contracts to be done in altering, or repairing the hotel could have been done without any entry upon the theatre or the entrance thereto; that there was no eviction of the defendants by the appellee from said premises, or any part thereof.

The first question presented is whether these facts constitute such an eviction as released appellants from the payment of rent during the period the theatre and hotel were undergoing alterations and repairs.   It may be said that in every lease there is an implied covenant that the tenant shall have the right of possession, occupancy, and beneficial use of every portion of the leased premises.   The tenant is regarded as having hired the use of the property as an entirety, and, therefore, if the landlord, after the grant, deprives the tenant of the possession and enjoyment of any part of the premises, the landlord shall not be entitled to any part of the rent during the time he thus deprives the tenant of his rights.   The landlord may not apportion the rent by his own wrong.   *Miller* v. *Michel,* 13 Ind. App. 190; *Avery* v. *Dougherty,* 102 Ind. 443, 52 Am. Rep. 680; *Morris* v. *Kettle,* 57 N. J. L. 218, 30 Atl. 879; *Colburn* v. *Morrill,* 117 Mass. 262; *Briggs* v. *Hall,* 4 Leigh. 484; *Skaggs* v. *Emerson,* 50 Cal. 3.

The more perplexing question is to determine what facts amount to such eviction as will authorize a suspension of rent.   Where there has been a physical expulsion of the tenant by the landlord from all or any part of the demised premises, the case is clear; but actual ouster is not required, and the difficulty arises in fixing the limit of the rule to the facts of the particular case.   The rule seems to be that while actual exclusion of the tenant is not necessary, yet, while the tenant's rights under the lease remain in force, it must appear that the interruption by the landlord has for its object a dispossession of the tenant, and is so direct and positive, and so substantial and permanent in character as to

operate as a material and effectual exclusion of the tenant from the beneficial enjoyment of some part of the leased premises.    *Royce* v. *Guggenheim,* 106 Mass. 201; *Hayner* v. *Smith,* 63 Ill. 430; *Lounsbery* v. *Snyder,* 31 N. Y. 514; *Lynch* v. *Baldwin,* 69 Ill. 210; *Barrett* v. *Boddie,* 158 Ill. 479, 42 N. E. 143; McAdam's Landlord and Tenant (3rd ed.) §§403, 407.   It is said in the Massachusetts case, *supra,* that "Any act of a permanent character, done by the landlord, or by his procurement, with the intention and effect of depriving the tenant of the enjoyment of the premises demised, or of a part thereof,   *    *    *   may be treated as an eviction."

In *Hayner* v. *Smith, supra,* the principle decided as expressed in the syllabus is: "To constitute an eviction, there must be more than a mere trespass by the landlord.   There must be something of a grave and permanent character done by the landlord with the intention of depriving the tenant of the enjoyment of the premises."

The cases of *Silber* v. *Larkin,* 94 Wis. 9, 68 N. W. 406; *Brown* v. *Holyoke Water Co.,* 152 Mass. 463, 25 N. E. 966; *Pridgeon* v. *Excelsior Boat Club,* 66 Mich. 326, 33 N. W. 502, and other cases cited by appellants aptly illustrate the character of interruptions by the landlord that will constitute eviction.

In the Wisconsin case the lessor owned two adjoining buildings, one of which he demised to the lessee.   He afterwards tore down the building which adjoined the rented house, rendering the leased building unsafe for occupancy, and then procured the municipal authorities to condemn and tear it down.   The lessee was awarded damages for eviction.

In the Massachusetts case a room with shafting and power was leased for the manufacture of mattresses.   The landlord for the purpose of dispossessing the tenant cut off the power.   Held, that the tenant was entitled to damages.

In the Michigan case the leased premises was a lot for a

boathouse. The landlord moored his boat across the entire front of the lot, effectually cutting off all access to the lot from the water, and in his action' for rent for the particular period held that he was not entitled to recover..

Any act of the landlord, transitory and fleeting in character, and not performed with intent to oust the tenant, must be regarded as a trespass for which damages will lie, and not as an eviction. As was said by the court in *Avery* v. *Dougherty*, 102 Ind. at page 447: "It is quite well settled that it is not every entry of the landlord, although wrongful, that constitutes a breach of covenant; a landlord may be a trespasser without breaking the covenant * * *. It is necessary that something more than an entry and injury be shown, for these are the elements of a trespass; it must also be shown that the entry was an assertion of right or title, in other words, was in the nature of a total or partial eviction." A late author says: "Trespass * * * embraces every unlawful entry upon the land of another. While such act in law constitutes trespass, it does not follow that it amounts to an eviction, which is something of a grave and permanent character done by the landlord, with the intention of depriving the tenant of the enjoyment of the demised premises, and which ultimately produces that result." McAdam's Landl. and Ten. (3rd ed.) §418. See, also, Taylor's Landl. and Ten. (8th ed.) §§380, 381.

Eviction is either actual or constructive, actual when the tenant is deprived of the occupancy of some part of the demised premises, and constructive when the lessor, without intending to oust the lessee, does an act by which the latter is deprived of the beneficial enjoyment of some part of the premises, in which case the tenant has his right of election, to quit, and avoid the lease and rent, or abide the wrong and seek his remedy in an action for the trespass. But in every case of constructive eviction the tenant must quit the premises if he would relieve himself from liability to pay rent; and whether or not he is justifiable in so quitting is a ques-

tion of fact for the jury. "No wrongful act of the landlord will suspend or extinguish the rent, if the tenant continues to occupy the premises during the time such rent accrued." Taylor's Landl. and Ten. (8th ed.) §381. "It is true that there are circumstances which may justify the tenant in abandoning the premises, and which in connection with the abandonment will support a plea of eviction by the landlord * * *. But we know of no case sustaining the doctrine that there can be a constructive eviction, without a surrender of the possession." *Boreel* v. *Lawton,* 90 N. Y. 293; *Barrett* v. *Boddie,* 158 Ill. 479, 484, 42 N. E. 143; *Dewitt* v. *Pierson,* 112 Mass. 8; *Jackson* v. *Eddy,* 12 Mo. 209; *Elliott* v. *Aiken,* 45 N. H. 30; *Crommelin* v. *Theiss,* 31 Ala. 412; 7 Am. & Eng. Ency. of Law, p. 38.

It is argued by appellants that as appellee put third persons in a place where they might commit the injuring wrongs, the doctrine of "independent contractor" does not apply, and appellee is therefore liable for the wrongful acts of his contractors and their employés. The covenant for quiet enjoyment relates only to paramount titles and to the personal conduct of the covenantor, either as active or permissive. It does not relate to third persons. Taylor's Landl. and Ten. (8th ed.) §§45, 304; Wood's Landl. and Ten. (2nd ed.) §477.

A lessee is as much in duty bound to defend his demise against strangers as to defend any other individual right. And while it is true that a landlord may not put another in a situation that will necessarily injure the tenant without being answerable, it is also true that the former is not precluded from making repairs, alterations, and improvements upon adjacent property, if the work may be reasonably accomplished without material impairment of the tenant's enjoyment of the leased premises; nor in the latter case is the landlord prohibited from contracting with a third person to do the work so as to exonerate himself from liability to the tenant. When the situation is such as reasonably to

permit and the landlord provides the means for the contractor to perform the work without any invasion of the tenant's rights, the law permits the contract to be so framed as to constitute the contractor an independent actor, to whom alone the tenant must look for wrongs committed by him, or his workmen, in the performance of the contract.   *Barrett* v. *Boddie,* 158 Ill. 479, 485, 42 N. E. 143; *Eisenhart* v. *Ordean,* 3 Col. App. 162, 32 Pac. 495; *Kimball* v. *Grand Lodge,* 131 Mass. 59; *Blauvelt* v. *Powell,* 13 N. Y. Supp. 439; *Fuller* v. *Ruby,* 10 Gray 285, 288; *Gilhooley* v. *Washington,* 4 N. Y. 217; Wood's Landl. and Ten. (2nd ed.) §477 p. 1107; McAdam's Landl. and Ten. (3rd ed.) §416.

The fact that repairs or improvements are made under the direction and subject to the approval of the landlord's architect as being in conformity to the contract, does not devest the contractor of his independent character, nor impose upon the landlord liability for the wrongful acts of the contractor, or his employes.   *Crenshaw* v. *Ullman,* 113 Mo. 633, 20 S. W. 1077; *City of Erie* v. *Caulkins,* 85 Pa. St. 247; *Powell* v. *Virginia, etc., Co.,* 88 Tenn. 692, 13 S. W. 691; *Welsh* v. *Lehigh, etc., Co.* (Pa.), 5 Atl. 48.

It is shown by the facts that the last entertainment of the season was given on May 19th, and at that time the house had no other engagement before September.   The alterations and repairs to the theatre and its entrance were all agreed to and approved by appellants, and no part of the work was entered upon until after the theatre was closed. The work upon the theatre and hotel, separated only by a brick wall, progressed together.   The work in the theatre entrance of changing the box-office from one side to the other, of filling up a door that communicated with the hotel with brick and mortar, and the cutting of an aperture in the same wall, and constructing a window therein, together with the removal and replacing of electric wires and heating radiators, necessarily resulted in disorder, dirt, and debris being in the entrance while such work continued, and which

would be inclined to tempt acquiescence by the appellants and indulgence by both the appellee and contractors, in the use of the entrance as a convenient place of storage of materials for and from the hotel. At most, it seems that the entrance was so used by general consent. Mr. English lived in the hotel from the beginning of the work to the 24th of July, during which period the obstructions now complained of continued in varying degrees, and no objection or complaint was made to him, or to any one representing him, by the appellants, or others for them, although it is shown that, in the time, the parties frequently met in the city and upon the premises, and conversed about the theatre and the extension of the lease. The only objection that seems to have been made by any one, at any time, to the general freedom of the entrance, was made by Mr. English, in ordering out certain bales of wire and mortar buckets. It is perfectly obvious that appellants felt no grievance from the obstruction before autumn, and not until it was determined in September that their lease of the theatre would not be renewed for another term upon its expiration. On the 1st day of June, 1896, they paid the last instalment of rent for the year then ending. On the 1st of August following, two months after the beginning of the obstruction, they paid when due, without complaint, the first instalment for the ensuing year. They opened the theatre on the evening of September 14th and without complaint or notice of a claim for damages, until November 5th, gave regular entertainments therein to the end of their term, June 1, 1897.

But conceding that appellants suffered such wrongs as amounted in law to constructive eviction from the entrance to the theater, it is clear that their liability for rent is not thereby discharged for two reasons: (1) Because it is shown that they elected to retain possession of the demised premises; (2) because it is shown that such wrongful acts were committed by third persons without authority or consent of the appellee.

With respect to the question of payment, the facts exhibited are that the rent due September 1st and October 1st was defaulted. November 5th the parties met, and in explanation of their default appellants asserted that they should be relieved from the payment of all, or some part, of the September and October instalments as damages for the disturbance of their possession. Mr. English contended to the contrary, and no agreement was reached, nor definite terms proposed; but upon Mr. English's suggestion that there was no dispute between them about the instalment due November 1st, it was sent to him by check on the following day. After this November payment some correspondence between the parties followed relating to the disputed instalments and the amount of appellants' damages, which resulted in the failure to agree, and thereupon Mr. English on November 11th instituted suit for the collection of the September and October instalments. November 30th appellants sent to appellee a statement of account as follows: "W. E. English to Dickson & Talbott, Dr.

To keeping of Dickson & Talbott out of possession of leased premises from June 13th to
Sept. 13, 1896........................$1,562.50
To money expended at request of Mr. English
in building new stage...................   463.00
                                        _____
                                         $2,025.50
By rent due Sept. 1st and Oct. 1;
1896 .....................$1,250.00
By rent due Dec. 1, 1896........   625.00
                          _____
                                         1,875.00
                                        _____
Balance due Dickson & Talbott............ $150.50."

Appellants requested that appellee remit the balance shown against him.

This was the first announcement of any definite claim and the first notice to appellee that any claim at all was made for the building of a new stage.

The instalment due December 1st not having been paid, appellee brought suit thereon December 10th. On January 2nd appellants sent appellee their check inclosed in a letter reading as follows: "Indianapolis, Ind., January 2, 1897. Will E. English, Esq., English Hotel, City. Dear Sir: Inclose you check for $474.50 rent English Opera House. Yours truly, Dickson & Talbott." On the same day appellee returned receipt acknowledging $474.50 "in part payment of rent of English Opera House for the month of September, 1896." No reply was made to English's acknowledgment and notice of application of payment. No further rents having been paid, on January 4, 1897, appellee instituted his suit for the instalment due January 1, 1897. Defaults were made in the payment of the February and March instalments and suits were instituted thereon. On the 1st day of April, 1897, appellants drew their check for $625 payable to appellee with the following indorsement: "April instalment of rent English Opera House", and transmitted the same to appellee by mail, but it was not deposited in the post-office until the 2nd day of April, and was not delivered to appellee until after he had on that day instituted suit for the instalment of rent falling due on the day before. Upon receipt of the check and under date of April 3rd, appellee wrote appellants acknowledging the receipt of the check, indorsed "April, 1897, instalment of rent, English Opera House," and stating that the failure of appellants to pay the rent when due had compelled him to bring suit therefor, and he had therefore given credit for the same less the amount of attorney's fees and court costs in the suit referred to, to which communication appellants replied on the same day: "Our check for April instalment of rent was mailed to you on April 1st, as has been the custom. If you accept the check it must be with conditions named on its face. We will consent to no modifications." Appellee cashed the check on the 5th of April.

It is insisted by appellants that the acceptance by appellee of the check for $474.50 on January 2, 1897, was an ac-

ceptance upon condition that it discharged all of appellee's claim for rent that had previously matured, including the month of January. And here again the dispute is not so much about what the law is as in its application. The rule of law may be said to be: When the amount due is in dispute, or is uncertain and unliquidated, and the debtor offers the creditor a definite sum in satisfaction, and accompanies the offer with such acts and declarations as will unmistakably indicate to the creditor the condition that an acceptance of the offer is a complete accord and satisfaction, such offer can only be accepted as payment in full of the claim. *Hutton* v. *Stoddart,* 83 Ind. 539; *Pottlitzer* v. *Wesson,* 8 Ind. App. 472, 480; *Petit* v. *Woodlief,* 115 N. C. 120, 20 S. E. 208; *Nassoiy* v. *Tomlinson,* 148 N. Y. 326, 42 N. E. 715; *Preston* v. *Grant,* 34 Vt. 201; *Boston, etc., Co.* v. *Peerless, etc., Co.,* 58 Vt. 551, 5 Atl. 407; *Fuller* v. *Kemp,* 138 N. Y. 231, 33 N. E. 1034, 20 L. R. A. 785. Before the creditor is compelled to go with less than the sum actually due him it must be perfectly clear that he accepted less with the full knowledge that it was offered him, only upon the condition that its acceptance should be in discharge of the whole claim.

In the Petit case, *supra,* it is said: "The party to whom the offer is made must of necessity understand, from its very terms, that if he takes the money he takes it subject to such condition;" and in the Fuller case this language is used: "To constitute an accord and satisfaction, it is necessary that the money should be offered in satisfaction of the claim, and the offer accompanied with such acts and declarations as amount to a condition that if the money is accepted it is accepted in satisfaction, and such that the party to whom it is offered is bound to understand therefrom, that if he takes it, he takes it subject to such condition."

There is no dispute about the facts in this case. The rent for September, October, December, and January, $625 per month, $2,500 was unpaid. On November 30, appellants

had rendered a statement to appellee claiming deductions on account of the alleged eviction from June 13, to September 13, 1896, and for money expended in the erection of a stage, aggregating $2,025.50. Thus upon this basis leaving due appellee, January 1, 1897, $474.50. Appellee knew that appellants made this claim; upon the other hand appellants knew, just as well, that appellee denied the validity of such claim. "Now, in this state of affairs", argues appellee's counsel, "two courses were open to the appellants. (1) To pay the amount admitted to be due, and then, if the appellee brought suit to recover more, and appellants made good their claim, appellee would have gone out of court without recovery and been cast in the costs. * * * (2) The appellants could have said: 'We admit so much to be due, and we pay it upon the condition that it be received in full.' But if they chose to pursue this course, they must make it clear that they intended to make the payment upon such condition, and not leave it a matter of conjecture whether it was not paid with a view to cast the peril of litigation upon the appellee. The appellee, of course, knew that they claimed $474.50 was all that was due; they, of course, knew that he denied it. In such a situation they could not play the part of Joey Bagstock and be 'sly, devilish sly.'" If appellants intended this check to be in full satisfaction of the claim, they made no effort to disclose it. They wrote in a letter accompanying the check, "inclose you check $474.50 rent English Opera House", and this is all they wrote, and, with the naked statement of account this is all the evidence appellee had that a condition was imposed to acceptance; and when on the same day and before the check was cashed appellee returned to appellants a receipt acknowledging $474.50 "in part payment of rent of English Opera House for the month of September, 1896," thus expressly calling appellants' attention to the fact that appellee did not understand that a condition was coupled with the check, no reply, or effort at correction, was made. Such conditions are not

Talbott *v.* English.

created by implication from such meager facts, and in law did not exist in this case. The facts relating to the April, 1897, payment (the ruling upon which is questioned by the cross-assignment of error) come within the rule above declared, and for reasons above given, and obvious from the authorities cited, the court did not err in holding that appellee's use of the check for the April payment, after notice of the condition, was a full satisfaction of that month's rent.

Complaint is made of the special finding of facts, which covers forty-seven pages of the transcript. It is quite true that it contains a vast amount of evidence and redundant matter, but we have failed to note, and appellants' counsel have failed to point us to the absence of any ultimate fact essential to the support of the conclusions of law. While items of evidence and evidentiary facts have no proper place in a special finding, yet often the line of demarkation between evidentiary facts on the one hand, and inferential and ultimate facts on the other, is so indistinct that cautious judges are led to give the finding the benefit of the doubt. The material thing in a special finding is a full statement of essential, ultimate, facts, within the issues, and if, perchance, redundant and immaterial matter gets in, it will not vitiate the finding, but will be treated as surplusage. *Whitcomb* v. *Smith,* 123 Ind. 329, 333; *Relender* v. *State,* 149 Ind. 283; *Rohrof* v. *Schulte,* 154 Ind. 183. What has been said of the law as relating to the subject of eviction and payment will dispose of the question arising upon the exceptions to the conclusions of law.

The allowance of attorneys' fees as a part of appellee's damages is contested both as a question of law and of fact. The lease reads: "And the said party of the second part agrees to pay attorneys' fees and other costs pertaining to this lease, or the enforcement of its provisions." It is asserted that this promise is conditional, and not absolute, and hence forbidden by §7532 Burns 1894, §5518 R. S. 1881

and Horner 1897. An implied condition that the lease may be brought into litigation is not sufficient to bring the contract within the inhibition of the statute. To be controlled by the statute "two things are clearly and unequivocally required * * *. First. The agreement to pay attorneys' fees must depend upon a condition. Second. The condition must be set forth in the instrument." *Churchman* v. *Martin*, 54 Ind. 380, 388; *Harvey* v. *Baldwin*, 124 Ind. 59. The foregoing stipulation to pay attorneys' fees is unconditional, and therefore valid. There was some evidence in support of the allowance, and under the rule we can not weigh it.

Some general objections are made to rulings upon the evidence, but no ruling as applied to any particular question or answer is pointed out or discussed, and we cannot, therefore, give such rulings consideration. Judgment affirmed.